All right. The next argued case is No. 21-1689, PlasmaCAM, Inc. v. CNCElectronics, LLC. Mr. Rogers. May it please the Court. Good morning. I first want to thank you for the opportunity to participate at this oral argument in person. I know you've been working through some difficult issues, including today, and I just want to let you know that I appreciate it, and as well, to allow the parties to appear remotely. It's very much appreciated. So, although the procedural history and the string of emails back and forth between the parties, which led to the District Court compelling appellants to sign a settlement agreement, may be a bit convoluted, but the primary basic... Counselor, I'd like for you to address a threshold issue, about as threshold as you can get, and that's our jurisdiction, and whether we have jurisdiction in this case. Yes. What can you point me to to show me that there's a final judgment that has been rendered by the Court below that would permit us to even know what we're to review? There was no separate final judgment, separate document as a final judgment issued by the District Court, and that's why the appellants take the position that this is an interlocutory appeal, and the jurisdiction for this Court is based upon the appellant jurisdiction for injunctions. There was affirmative relief in the Court's order compelling the defendants to sign a settlement agreement, and that's injunctive relief, and this Court has appellant jurisdiction under Title 28 for reviewing an interlocutory decision, interlocutory appeal of an injunction. The appellee takes a different position. They view the orders issued by the Court themselves as a final judgment, and they believe that it is an appeal from a final judgment. So we have two different positions as far as what the jurisdiction is, but either way, whichever way this comes down to, you do have jurisdiction. I can add that there has been further proceedings in the District Court which neither side has supplemented the record, but I can tell you it is in the record. There was a hearing, a telephone hearing like a status conference from the Court. And the Court ended up closing its records, right? Closed the case? The Court administratively had closed the case long before, but when there was this two separate positions taken by the parties at the outset of this appeal, in our docketing statement I believe, the appellee filed what they were supposed to have filed long ago, a motion to dismiss pursuant to the settlement agreement. So the District Court did not rule on that motion to dismiss. The District Court had a status conference, telephone conference, and there is a record of it if the Court wants to review that. But basically what happened on that conference was the District Court expressed its view that it had issued a final judgment, that its orders were intended to be a final judgment. As the appellants... I believe there is a final judgment, but I can tell you that the order... How do you have jurisdiction if there's no final judgment? You have jurisdiction to review as an interlocutory appeal the injunction. So regardless of which side it goes, whether it's a final judgment, and that's how you have jurisdiction, or an interlocutory appeal, you still have jurisdiction. And the relief that the appellants are requesting in either case, whether it's remanding for the District Court to be ordered to have the parties correct the definition of covered products in the settlement agreement that the Court compelled the appellants to sign, or our alternative request that the Court vacate the order compelling the appellants to sign a settlement agreement to which they did not agree, and remanding for trial. Let me ask you about the merits here. Yes. I think you've got a strong argument that the parties in January of 2020 agreed on the language for covered products, and that that's contrary to what the District Court did. What concerns me is that even though the parties may have agreed on the language, I'm not sure that they agreed on the meaning of that language. And if we were to rule your way and say that's the language that ought to be included in the agreement, aren't we just opening the door to future disputes here about what that language means? Because I don't think you agree on what it means. If you're talking about the, we certainly agree on a mutual release, the dispute issue is covered products. I think you do agree on, I'm talking about the covenant not to sue. Okay, so the covenant not to sue, if the result is a remand with a correction of that definition to be the one that the appellants assert we thought was resolved January 21st, I don't, I'm actually, I would ask you what, is there a particular part of that that maybe that the parties don't agree on? Because I don't think we had a follow-up, I don't know that we had a follow-up dispute on the meaning of the definition of covered products that we agreed to in January 21. Well, it may be that there's a dispute, continuing dispute between the parties as to the coverage of future products under that language. You taking one view of that language and the other side taking another view of that language. Well, I thought the January 21st resolution, the final version of the version of January 21st that we believe was the final version. I don't know that there is any dispute over that, that it's future products, regardless of what they are, any future products. So, if I'm reading that too broadly, maybe there is a dispute. It doesn't surprise me that you're taking that position. I'm sorry? It does not surprise me that you're taking that position. Yes. I'm not sure your opposing counsel would take the same position. Okay. Well, maybe not. If we agree that there was no agreement, no mutual understanding, then we go back to whether there's infringement, right? Then you get to have an infringement suit. Yes. And that's the result of our alternative argument. And I can tell you, even though it's phrased as an alternative argument, I think that's probably where we should end up. But wasn't there a concession that the claims were being practiced? No. We've always disputed infringement. The stage of this case, when we reached what we thought was a settlement agreement, December 20th of 2019, the negotiations right at that point that led to, you know, what kicks things off that people finally, you know, have a settlement in the middle of the case. No, exactly. And that was the point of that case was the plaintiff's deadline to submit documents on claim construction issues. So you're telling us... So that's where we were. You're telling us there was no agreement, there was no settlement, nothing was signed. It's over. That's our alternative argument, is that there is no... Well, our argument is that the court's... the version of the document, the settlement agreement that the court compelled the appellants to sign, we never, absolutely never agreed to that. Our primary argument is that there was a settlement December 20th of 2019, just that email. But if it turns out, if there's some ambiguity in there, if that's not a binding settlement agreement, then yes, we asked that this case be returned for... remanded for trial. And we'd go back to where we were in December 20th. There's no meeting of the minds, there's no agreement. So we have to, in order to even remand for whatever reason, we have to say there was no meeting of the minds, so there was no agreement, so there was no settlement. So we're going to sue you for infringement. Correct. That's where we'd end back up, and we'd pick back up on our deadlines where we left off on December 20th, and we'd move forward with the case with claim construction, claim interpretation, our non-infringement defenses, our invalidity defenses, back to where we were. And the appellants are fine with that. How does that help your client? You come away with nothing. We would defend the case, and likely invalidate the patent. That's where we intend for this to go. Or win on our non-infringement defenses. But my folks are comfortable with going back down to where we were December 20th of 2019, and getting back on the scheduling order, and moving forward with the case. Yes, and that's really a question for the other side as well. Yes. Okay, well I think we can pause. We'll save you rebuttal time. Okay, thank you. Thank you. Okay, so we can see Ms. Rodgers. Okay, can you hear us, Ms. Rodgers? Ms. Spatz, yes, Your Honor, I can. Okay. All right, then please proceed. May it please the Court. C&C would have this court determine that PlasmaCam accepted nearly $50,000, not only to settle this case, but to give C&C. I'm having difficulty in understanding how you can take the position that the parties didn't agree on the language in January of 2020, when your client specifically said, we're okay with the definition in your revised draft. Yes, Your Honor. In January, when PlasmaCam made that proposal, we said that we would concede on the definition of covered products if, and contingent on, them conceding on the scope of the release. Okay, where is that language, please? Show me where that language, making it contingent, is. I don't see it in the record. Where is the language? Yes, Your Honor, and as the District Court also found, but yeah, let me find that for you. Thank you. So, it is docket number 69, Exit Melissia. In the appendix, Your Honor, at, that page for you. Appendix page 10 is our argument where we quote it. No, show me the document. Yeah, docket number 69, Exhibit 6. Page, page in the appendix, please. The page in the appendix is, that's, Appendix 10, APPX 10. Let me pull this up here. That's not a document. That's the district judge. Yes. Where's the document? Where's the document that makes this reservation? It is the January 20th, 2020 email from me. Where is the document in the record? Yes, Your Honor. Hang on one second. Okay. The language we're looking for is. You're supposed to be familiar with the record in the case. Yes, Your Honor. I had a different. Okay. So, Your Honor, if you would look at, actually, I know where it is. I do have it in my notes. Sorry. If we look at the. Appendix at. 766. Is my email. To Tom. Or I say. And that happens to be an exhibit. That's fine. Okay. So, January 17, 2020, I say, I spoke with Jason, and we're willing to make one additional compromise. Okay. I'm sorry. That's a little bit later.  Sorry about that, Your Honor. Okay. I think it's on page 790, Your Honor. I'm getting there, but I believe it's 790 where I make that proposal, and I make it contingent upon them except accepting the release. Here it is. Yes, it is. It is appendix. 777. And my email to Tom says, we'll agree to your change in paragraph two. However, after much discussion and review of the email correspondence and notes of settlement, we're confident that it was never the intention to release your client from claims that are unrelated to the claims pending in this case. And I go on to say, the more you push for this release, the more that we believe that it's your intention to produce more products in the future, that will be a problem. PlasmaChem does not have any of your client's products in its possession and does not know if the current products infringe the claims of its other patents. So what I'm saying in that email, which is appendix 777, is we'll accept your definition of coming products if you accept our release, our version of the release. What language in the email makes the agreement about paragraph two contingent upon agreement about the release? The word, however, is immediately following my statement that we would accept that change. I say, however, we cannot accept your other change. So we're in a settlement discussion. And in that settlement discussion, we say, we'll take that. But however, we cannot accept your others. And his response is actually to say no to that. He specifically rejects that in response. And you eventually agreed on the language for the release, right? We—well, yes, Your Honor. I think not—we don't agree before the settlement—I mean, I'm sorry, before the court gets involved. But once the court gets involved, we each individually brief these questions. And when we each individually brief these questions, we determine that both parties take the approach that if we simply say that we're releasing the claims that were brought or should have been brought in this case, then we could both live with that. And the district court notes, oh, okay, well, both parties' independent briefs both say that they both could live with the language of releasing the claims in this case that should have been brought in this case, which, again, is the products at issue in this case. So when we come to an agreement in the briefing, we are coming to an agreement based upon the understanding of both parties that we will limit the release to this claim in this case, which is that these products infringe this patent. And, Your Honor, all the covenant not to sue was was an extension of that release into the future, not to future products, but to future claims. So not only would we release you for past conduct, but we would release you from future conduct. In the future, if you continue to infringe this patent with this product, we won't sue you for it. Okay, it looks to me as though having agreed to the definition of covered products, you're now trying to get out of that. We never agreed to that definition in a vacuum, Your Honor, as the district court found, which I believe is reviewed by clear error. As the district court found, that was a negotiated proposal that we made as part of a proposal to accept our version of the release that we wanted at that time, which they rejected. So, Your Honor, the reason Rule 408 exists is it's not particularly good public policy to tell people that if they make proposals in the settlement context, that those proposals can be used against them. And that's exactly what's happening here. Mr. Warden and C&C is arguing that we should be stuck with a proposal that we made early on in the negotiation, but that proposal was rejected. Do you agree that this covered products language that was in this January discussion applies to future products? I'm not sure what time frame you're talking about. If you mean in my email to Tom where I said, yeah, we would accept that change. Yes, at that time, I was referring to that change that we would have accepted if they at that time would have accepted the rest of our proposal. So that change would apply to future products? Yes, Your Honor. At that time, we were willing to accept that in conjunction with our overall proposal that we were making. Which also, Your Honor, was many, many months before we actually spent all the money briefing this issue. So we're trying to avoid getting in front of the court. We're trying to avoid getting the court involved. So we made a concession, again, contingent upon them accepting another concession or another proposal. They reject it. And then later on, after we've spent all the money, after we've fully briefed this issue, then they come back and say, oh, you accepted that proposal back then. No, we accepted that as part of a bigger picture. And things have very much changed later on. And, Your Honor, I also would like, if I could, to address the issue of whether or not there was a meeting of the minds. There absolutely was a meeting of the minds. Both parties agreed on December 20th, 2019, that they were settling this lawsuit. It's undisputed that they were settling this very lawsuit. And again, the district court agreed. And that determination is reviewed for error. The standard of review would be plain error. And also, the defendants waived the argument that it was an enforceable settlement. They took exactly the opposite position below, that it was an enforceable settlement. And now they're saying, well, if we don't get our way, then it's not an enforceable settlement. So I think this court should not find that the district court would clearly err when they determined that there was an enforceable settlement. It is not good judicial policy for us to go back and start from square one. We had a resolution. We both agreed that there was a pending case, that that pending case was being resolved, that they were paying us money to do it. And to go back and start over, I don't actually think is what either party wants. But I believe that counsel is arguing that in the alternative, that's what they would accept. What is stunning to me, Your Honor, is that CNC is taking the position that by settling this case, they could go make any future product they wanted, anything that they wanted to do to infringe this patent. And there was no language anywhere in the December 2019 agreement that would have indicated that. And it is absolutely appropriate to look at a settlement of a case, or any agreement, in the context of what were the circumstances. And the circumstances, again, were we resettling that case. And now they want to go make other products that will infringe the 441 patent, even though that was never an issue in this case. And we spent a lot of time litigating the issue of the release being limited to what was brought in this case and what should have been brought in this case, and nothing else. And they knew all along that that was our position. They never raised the issue. And then we raised it in our reply. And in the oral argument, they told Judge Mazzant that they thought we were all in agreement. And that was after we said in our reply that we believed the definitions covered parts was current parts plus updates and bug fixes. So, you know, I think this is a case where we settled, and they paid, C&C paid for an inch, and now wants to take afloat. It's important to point out, Your Honor, that any agreement cannot be read in a vacuum. Again, it was a part of a negotiated settlement. And the argument that C&C has made is, well, your email didn't specifically say it was limited to covered parts. But releases are read very narrowly in the Fifth Circuit and in Texas. And should be read narrowly. And so if it didn't talk about anything except releasing this case, then it shouldn't be expanded to other products. And, again, Your Honor, I know that you have concerns about whether our decision or our concession was in a vacuum or not. And it wasn't. And I apologize that it took me a long time to find Appendix 777. But I think if you read that email in context, you will see that our concession on that point was very much contingent upon them accepting our version of the release. And rightly so, because it was a big concession that we were making, and it was to try to avoid months of briefing, months of, you know, again, we settled for $50,000, Your Honor. We spent more than that arguing about this at this point. It was such a bizarre situation that we were just simply trying to make peace and move on. But they wouldn't accept our release. They continued to cost us money. They continued to argue the issue. Even after we made that concession, they wouldn't accept our concession that they ultimately, by the way, ultimately accepted. And just continue to – even today, in their opening brief, they continue to argue that they can make products that infringe other patents, other than the patent in suit. They continue to push for how much can we squeeze out of this. That was never the intention of the settlement. I already covered that. I already covered that. If the release was indeed limited to the claims made in this case, how can the argument be that they could include products that didn't even exist at the time that we entered into the release? The scope of the release must be limited by what was brought in this case and what could have been brought in this case – I'm sorry, what should have been brought in this case. And that includes our definition of covered parts, Your Honor. And I see that I'm out of time. Any more questions for Ms. Speth? Thank you, Ms. Speth. Ms. Speth? The experts will disconnect. Okay, Mr. Rodgers. I first do want to make one correction or clarification, and it goes to your question, Judge Steik, about whether there would be a dispute over the January 21st agreed definition of covered products. And I referred to that covenant not to sue in that form as covering all future products. Hearing the back and forth in the follow-up argument, I hear that there may be some concern that it's an unlimited covenant not to sue, just completely unlimited. Well, the agreed definition from January 21st is limited. It's limited to the patent in suit. So it is all future products, but there's still some limitation on it. So it's not completely unlimited, and there shouldn't be that concern. The other point I want to raise is the view from the statements from the appellee that the January 21st, 2020 definition of covered products agreement was agreed as part of a bigger picture and that they should be allowed to go back on that. The appellants didn't view it that way. They viewed the process as the narrowing of the disputes. And what we were trying to do is narrow the disputes for what the court would end up having to resolve. And appellants believe that we succeeded in that. We narrowed the issues down to the mutual release, nothing more. We agreed to covered products, and both sides went to the court and said, we have a dispute that's limited to the mutual release. They didn't say our definition of covered products, yeah, we agreed to that, but it was contingent upon some other things or we reserved our rights. That's not what they said. They presented to the district court what the appellant's view was, that all issues had been resolved other than the mutual release. And that was all for the district court to decide. So, yes. Eventually you agreed on the mutual release. Ultimately then, after then briefing, then the appellee came back and submitted to the court the version of the mutual release that we had proposed. And so, yes, we ultimately then did, through the conclusion of the briefing, agreed on the mutual release. So there was nothing more really for the court to do other than maybe to rubber stamp the agreement on the mutual release. And so in that case, that's our primary argument, that our request for relief is that this court vacate the district court's order compelling the appellants to sign an agreement they did not agree to and order the district court to have the parties correct the agreement, and then the case would be over. With one caveat, there is one caveat. Throughout this process, built into that December 19th, December 20th, 2019 email was a penalty provision if we paid late. And so we would ask as a part of, if the remand goes along that line, that we get our penalty funds back because we weren't the ones blamed for the delay in the payment. After we thought we had an agreement, there was continued dispute, and certainly we weren't going to pay a settlement payment when the other side is backing down on what we thought they'd agreed to. And so, yes, we ended up with an order not only compelling us to sign an agreement and compelling us to pay settlement funds, we were also ordered to pay a penalty. And so we'd ask, under those conditions of a remand, we'd ask for those funds to be returned. The other issue I'd like to bring up is the value of this case. We hear repeatedly from the appellee that this is a low value case. It's just $50,000. That's just not the case. If we end up with this agreement that we were compelled to sign that has a limitation we didn't agree to, to current products, and we're not allowed to freely make new products, we're subject to this amount that we paid for a settlement in cost of defense, potentially unlimited for each new product that we come out with. And that is the piece that we thought we bought when we entered into that settlement agreement through the emails on December 20, 2019. And so I just have to say that the value of this case is very significant to our client. It's not what the appellee presents, and that goes back to my appreciation for allowing me to participate in person in this oral argument. And I think I'll reserve the rest of my time. I'll release the rest of my time unless there's any questions. Okay. Any more questions? Any more questions? Okay. Thank you, Mr. Rogers, and our thanks to both counsel here and remotely. The case is taken under submission. And that concludes this panel's argued cases for going to say this morning for today.